# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

        **Plaintiff,**

        **v.**

**R&L CARRIERS, INC.,** *et al.*,

        **Defendants.**

**Case No. 1:17-cv-515**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

"Facts are stubborn things, but statistics are pliable." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) (citing Mark Twain). This case turns on statistical analysis that David Neumark, the Equal Employment Opportunity Commission's statistician, conducted. The EEOC says his analysis reflects stubborn facts—that R&L Shared Services and R&L Carriers Inc. (individually "Shared Services" and "Inc." and collectively "R&L") discriminated against women. But R&L says Neumark's analysis stretches well beyond the permissible bounds of statistical pliability and is thus inadmissible. For the reasons discussed below, the Court concludes that Neumark's analysis may well be wrong, but that, even if so, it is not so clearly wrong to preclude admissibility. Rather, its correctness is a matter for the jury to decide. And that determination also ends up resolving many of the other outstanding motions here as well.

The EEOC brought this case in 2017, alleging that R&L discriminated against female applicants for dock loader positions at its Wilmington, Ohio, terminal for

years. Trial is now approaching. Currently before the Court are three motions for summary judgment: one by Shared Services, another by Inc., and a final one—for partial summary judgment—by the EEOC. Accompanying these are a host of motions to exclude the testimony of various witnesses—several expert witnesses and one deceased lay witness.

Of the witnesses, Neumark is key. Shared Services concedes that if the Court admits Neumark's testimony, there is a genuine dispute of material fact. Meaning, if Neumark is in, Shared Services' summary judgment motion is out. Likewise, though it changed its tune in its post-hearing brief, the EEOC agreed at oral argument that, should the Court exclude Dr. Neumark, there is little left to its case.

For the reasons discussed below, the Court concludes that Dr. Neumark's statistical analysis, while open to attack on various points, clears the bar for admissibility. That means the Court **DENIES** R&L's Motion to Exclude Neumark's Testimony and Opinions (Doc. 132) and **DENIES** R&L's Motion to Strike Neumark's March 16, 2022, Declaration (Doc. 163). As a result, the Court also **DENIES** Shared Services' Motion for Summary Judgment (Doc. 130).

Inc.'s Motion for Summary Judgment (Doc. 131) turns on an unrelated issue. Inc. claims that it is not part of an integrated enterprise with Shared Services. The Court disagrees and concludes that it does constitute an integrated enterprise. So the Court **DENIES** Inc.'s motion.

Then there is the EEOC's Motion for Partial Summary Judgment (Doc. 134). There, it claims that four of R&L's affirmative defenses fail as a matter of law. At oral

argument, R&L seemingly withdrew one of those defenses—the EEOC's alleged failure to conciliate, and anyways, the parties have since had a go at mediation. So the Court **DENIES** the EEOC's motion on this front as moot. As to the other three, the Court concludes that those affirmative defenses fail as a matter of law. The Court thus **GRANTS** the EEOC's motion in part.

As for the remaining motions to exclude, the Court will treat those as motions in limine, and will thus reserve ruling on them until closer to trial, or even perhaps until the Court has heard a voir dire of the relevant witness at trial.

## BACKGROUND

The procedural history of this case is ponderous. Given the unwieldy record, the Court limits its discussion of facts to those strictly necessary to this decision.

The EEOC sued R&L in 2017, alleging R&L discriminated against female applicants for dock loader positions at its Wilmington terminal, violating Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. (Compl., Doc. 1, #3–4). It is bringing a *Teamsters* pattern-or-practice case—a type of discrimination case hinged on statistical evidence of discrimination. So the EEOC hired David Neumark, an economist, who offered such statistical analysis (specifically, a multiple regression analysis) in expert reports (Docs. 132-1, 125-1). Not surprisingly, R&L hired its own expert, Paul White, to refute his conclusions (Doc. 127-4), and R&L also deposed Neumark (Docs. 120, 137).

R&L later moved to exclude Neumark, arguing that he omitted major variables from his regression analysis and thus his testimony was inadmissible. (Doc. 132).

Shared Services moved for summary judgment, arguing that without Neumark's testimony, the EEOC had no case. (Doc. 130). Neumark offered a declaration defending his initial report. (Doc. 153-7). R&L moved to strike that declaration. (Doc. 163).

Separately, Inc. moved for summary judgment, arguing that it was not liable for any of Shared Services' behavior, since it did not constitute an integrated enterprise with Shared Services. (Doc 131). The EEOC, meanwhile, moved for partial summary judgment in its favor on R&L's integrated-enterprise affirmative defense, along with three other affirmative defenses that R&L offered in its answer. (Doc. 134).

In November 2022, the Court heard oral argument about Neumark and the summary judgment motions. There, R&L withdrew its conciliation defense after being informed that the remedy would be to postpone trial and return to conciliation. Given a rapidly approaching trial, it's time for the Court to decide these motions.

## LAW AND ANALYSIS

### I. R&L's Motion to Exclude Neumark's Testimony and Opinions

R&L opens its motion by quoting another old saw attributed (some say wrongly) to Twain—"There are three kinds of lies: lies, damned lies and statistics." (Doc. 132, #8972). That's telling. A jury, not a judge, sorts lies from truths. The judge's job is to ensure that testimony, whether honest or a "damned lie," meets the legal requirements to present to a jury. *See Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 583 (E.D. Mich. 2022) (citing *Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409, 2018 WL 6843305, at *7 (E.D. Mich. Oct. 30, 2018)). Here, Neumark's testimony does.

A court will admit an expert's opinion into evidence if it meets three requirements:

1. [T]he witness must be qualified by knowledge, skill, experience, training, or education.
2. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.
3. Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (citing Fed. R. Evid. 702) (internal quotation marks omitted).

R&L confines its challenge to the last of those—it disputes the reliability of Neumark's testimony. The Federal Rules of Evidence provide trial courts "general standards to assess reliability," including:

- whether the testimony is based upon sufficient facts or data
- whether the testimony is the product of reliable principles and methods, and
- whether the expert has applied the principles and methods reliably to the facts of the case.

*Id.* at 529 (internal quotation marks omitted). And the Supreme Court, in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony," including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal*, 527 F.3d at 529 (citing *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

Neumark offers multiple regression analyses purporting to show that R&L discriminated against women when hiring dock loaders. (*See* Resp., Doc. 162, #11319–21). What is multiple regression analysis?

> Multiple regression analysis is a statistical tool for understanding the relationship between two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.
>
> …
>
> In a case alleging sex discrimination in salaries, for example, a multiple regression analysis would examine not only sex, but also other explanatory variables of interest, such as education and experience.

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in *Reference Manual on Sci. Evid.* 179, 181 (Michael J. Saks, David L. Faigman, David H. Kaye, Joseph Sanders, eds., 2d ed. 2000).

Regression is an accepted form of statistical analysis, and courts regularly admit regression models into evidence. *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, No. 2:12-CV-2778, 2015 WL 12001264, at *5 (W.D. Tenn. June 30, 2015) (collecting cases). As the EEOC notes, "[b]ecause, 'as a scientific technique, the validity and acceptability of a properly performed multiple regression analysis is widely accepted,' courts 'need not examine the four factors set forth in *Daubert*,' but can focus instead on the specific challenges to admissibility raised by the opponent." (Doc. 162 at #11330–31 (quoting *Est. of Hill v. ConAgra Poultry Co.*, No. 4:94-cv-198, 1997 WL 538887, at *4 (N.D. Ga. Aug. 25, 1997))). That said, as R&L rightly points out, this doesn't mean that courts should abdicate their roles as gatekeepers just because the offered evidence is a regression analysis. (Reply, Doc. 167, #11537–38).

R&L's chief complaint here is that Neumark's regression analysis omits key "explanatory variables." (Doc. 132, #8977). "[N]ormally, failure to include variables will affect the analysis'[s] probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part and joined by all Justices)); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (same). And "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Conwood*, 290 F.3d at 794 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).

But regression analysis becomes unreliable and therefore inadmissible when it omits *major* explanatory variables. *Bazemore*, 478 U.S. at 400; *see, e.g.*, *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 894–95 (W.D. Ky. 2020); *Universal Coin*, 2015 WL 12001264, at *10–12; *The Iams Co. v. Nutro Prod., Inc.*, No. 3:00-cv-566, 2004 WL 5496244, at *5–6 (S.D. Ohio June 30, 2004), *on reconsideration sub nom.*, 2004 WL 5831566 (S.D. Ohio Aug. 23, 2004).

Perhaps unsurprisingly, the parties disagree whether the variables Neumark allegedly omitted here are major. The contested omitted variables are:

- whether an applicant applied for "any" position or for the loader position in particular.
- whether an application is active.
- which Recruiting Specialist hired the applicant.

(Doc. 132, #8973–74). Beyond the omitted variables, R&L says that Neumark also makes several material errors in the data underlying his analysis, which also make

that analysis inherently unreliable. (*Id.* at #9004–06). All these alleged flaws lead to what R&L characterizes as an abysmal $R^2$ value. (*Id.* at #8997–98).

> *R*-square ($R^2$) is a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables. Thus, $R^2$ provides a measure of the overall goodness-of-fit of the multiple regression equation. Its value ranges from 0 to 1. An $R^2$ of 0 means that the explanatory variables explain none of the variation of the dependent variable; an $R^2$ of 1 means that the explanatory variables explain all of the variation.

Rubinfeld, *Multiple Regression*, in *Sci. Evid.* at 215–16. The $R^2$ value in Neumark's most complete model—which R&L's expert calculates in percentage form as ranging from 5.16% to 13.16%—is low. (*See* Doc. 127-4, #8494). EEOC admits that. (*See* Doc. 162, #11349–56). R&L says this too renders Neumark's testimony inherently unreliable. (*See* Doc. 132, #8995–98). The Court will address each of these alleged problems in turn.

### a. Major omitted variables

R&L claims that Neumark omitted several major explanatory variables. (Doc. 132, #8984). First, the Court will address who has the burden to show that an omitted variable is major. Then, the Court will determine whether to consider Neumark's March 16 declaration, where he tries to address some of these variables. Finally, the Court will consider each of the variables to see if they qualify as omitted major explanatory ones.

### i. Burden

The Court begins with the parties' dispute on the burden of proof. R&L says it doesn't have the burden to prove that Neumark's testimony is inadmissible. Rather,

the EEOC must show it *is* admissible. (Doc. 167, #11549). This is true. And the EEOC *does* address the Federal Rules of Evidence and the *Daubert* factors to do this. (Doc. 162, #11327–29).

But the EEOC also collects several persuasive cases from sister circuits to support the notion that, when a party claims that an expert has omitted a major explanatory variable in a regression analysis, the challenging party ought to provide *some* evidence that the omitted variable is in fact major. (*See id.* at #11331–32 (citing *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988); *Palmer v. Shultz*, 815 F.2d 84, 101 (2d Cir. 1987))). This makes sense. Otherwise, the Supreme Court's *Bazemore* rule—that omitting variables in regression analysis seldom affects admissibility—is rendered meaningless. Parties could avoid that presumption by claiming with impunity that every omitted variable is major, forcing the proffering party to justify every one of those variables.

R&L says these cases are inapt, because "each case considered the credibility of an expert's conclusion at trial." (Doc. 167, #11550). That is a very different procedural posture than considering the admissibility of an expert's conclusion *before* trial, the argument goes. R&L then offers a case that makes this exact point, *Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006), which characterizes *Sobel* as going to *probativeness* rather than *admissibility*. (Doc. 167, #11550); *Freeland*, 238 F.R.D. at 146. Ultimately, *Freeland* concludes that in proving *admissibility*, "it is the

proponent who must establish that the major factors have been accounted for in a regression analysis." *Id.* at 145.

This is a good argument and a close call. But ultimately, the Court concludes R&L is mistaken. While *Sobel* and its predecessor *Palmer* both concern the probativeness of an expert's testimony, *Hemmings* explicitly addresses admissibility and cites *Sobel* alongside *Bazemore* while doing so, suggesting that *Sobel* is in fact applicable to the admissibility question as well. *See Hemmings*, 285 F.3d at 1188 (citing *Sobel*, 839 F.2d at 34) ("[Plaintiff] contends that failure to include [variables] rendered the analysis *inadmissible* under [*Bazemore*]. We disagree. [Plaintiff] did not prove at trial that any of these factors were important to the subjective and undefined promotion process or compensation awards. We have recognized that a defendant may not rest an attack on an 'unsubstantiated assertion of error.'" (citation omitted) (emphasis added)). While this was an appeal focusing on the plaintiff's failure to provide any assertion of error *during* trial rather than before trial, recall that the court explicitly notes that it is analyzing *admissibility*. This is the standard facing the Court here.

More troubling for the Court is *Freeland*, which seems to suggest that the proponent of expert testimony must prove that it included all major factors. *See Freeland*, 238 F.R.D. at 145. But ultimately *Freedland* is unpersuasive for two reasons. First, of the cases discussed above, more courts seem to go the other way (and at the circuit level too). And second, following *Freeland* would force the Court to flout the Sixth Circuit's commands. After all, the Sixth Circuit said: "[i]n order to be

10

*admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Conwood*, 290 F.3d at 794 (internal quotations and citations omitted). If this Court required experts to prove that all variables they omitted were not major, that would force them to eliminate all other possible causes of injury, contradicting *Conwood*. So in considering each omitted variable, the Court will look for some evidence R&L provides that shows the variable is major.

### ii.      Neumark's March 16 declaration

Neumark argues that the omitted variables are not major ones in his March 16 declaration. (*See generally* Doc. 153-7). R&L says that the declaration should be excluded, because it is an expert opinion offered years after the close of discovery, in violation of Fed. R. Civ. P. 26. (*See generally* Doc. 163). The Court disagrees.

"Nothing in Rule 26 … precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case. … Rule 26 must be read in light of its dual purposes of narrowing the issues and eliminating surprise." *McHugh v. Olympia Ent., Inc.*, 37 F. App'x 730, 735 (6th Cir. 2002). The Sixth Circuit suggests that when new expert testimony "did not constitute unfair surprise" and "was not a departure from the general scheme of the [expert's] report," it is not a new expert opinion under Rule 26. *See id.* at 736.

*McHugh* "contemplate[s] that Rule 26 should not be read so narrowly to prevent an expert witness at trial from (1) rebutting the analysis by another expert or (2) clarifying his or her opinion." *Hochstein v. Microsoft Corp.*, No. 4-cv-73071, 2006 WL 8066573, at *5 (E.D. Mich. Oct. 13, 2006). And while *McHugh* "deal[s] with

purportedly 'new' expert opinions at trial rather than at the summary judgment stage[,] … similar reasoning should apply to expert declarations attached to summary judgment motions." *Id.* (citation omitted).

> Hence for the purposes of summary judgment, this Court holds that the proper standard for evaluating Defendant's Motion to Strike Portions of the expert declaration in question is to determine initially what, if any, of Plaintiff's expert's declarations are "new." By "new," the Court should determine initially whether the expert is attempting to rebut the analysis of another expert or to clarify his or her position, comporting with the "general scheme" of the report.

*Id.* (citing *McHugh,* 37 F. App'x. at 735–36).

Neumark's March 16 declaration constitutes a clarification "in response to points raised in the presentation of a case." *McHugh,* 37 F. App'x. at 735. R&L's expert and R&L during deposition both suggested that Neumark was missing several variables. (Doc. 127-4, #8471; Doc. 120, #6639–40, 6644). Recall, though, that R&L did not suggest that the variables were important enough to affect admissibility until the summary judgment stage. (Resp., Doc. 171, #11765). At that point, Neumark offered his analysis clarifying why he omitted those variables and rebutting the idea that they were important or incompatible with his conclusions. (*See generally* Doc. 153-7). So not only does his declaration *not* depart from the "general scheme" of his original opinion, but it doubles down on that scheme. And R&L cannot claim unfair surprise about his analysis of these variables, because it raised these variables and now says they are so important as to render Neumark's expert opinion inadmissible. All the declaration does is explain why that is not the case.

12

R&L calls *McHugh* an "outdated ruling," because it cites cases which predate the 1993 changes to the Federal Rules of Civil Procedure. (Reply, Doc. 172, #11787). That makes no sense. The Sixth Circuit decided *McHugh* in 2002, well after those rule changes. The *McHugh* court was aware of those changes and felt that its holding was compatible with the new rules. R&L makes no suggestion that, since *McHugh*, the rules have again changed.

And while R&L suggests that the Court should disregard *McHugh*'s "general scheme" rule because neither the Sixth Circuit nor this Court has applied it since, (Doc. 172, #11788), many other district courts in our circuit *have*. *See, e.g.*, *Hochstein v. Microsoft Corp.*, No. 4-cv-73071, 2006 WL 8066573, at *5 (E.D. Mich. Oct. 13, 2006); *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 250 F. Supp. 3d 244, 261 (W.D. Ky. 2017); *Counts v. Gen. Motors LLC*, No. 16-cv-12541, 2020 WL 6937937, at *9 (E.D. Mich. Nov. 25, 2020); *Auto Prop. & Cas. Ins. Co. v. Abernathy Motorcycle Sales, Inc.*, No. 118-cv-1077, 2022 WL 567052, at *3 (W.D. Tenn. Feb. 24, 2022). That's persuasive. So *McHugh* is good law.

Thus, the Court **DENIES** R&L's Motion to Strike Neumark's March 16 Declaration (Doc. 163).

### iii.    "Any" position

The Sixth Circuit has suggested that where an expert "ruled out all plausible alternatives for which he had data" and "accounted for all variables raised by [the other party's] own expert," this is sufficient but not necessary to show that he did not omit any major variables. *Conwood*, 290 F.3d at 794.

13

Consider the first omitted variable—whether applicants were seeking any open position or only loader positions. As R&L rightly points out, the EEOC's chief psychologist himself admitted that female applicants who expressed a desire for "any" position were more likely to choose non-loader positions. (Doc. 132, #8990). But R&L does not offer *any* evidence that this omitted factor is a major factor in Neumark's regression analysis—for example, by showing that controlling for the variable reduces or eliminates the sex differential in hiring. And though Neumark omitted the variable, he also explained *why* in his rebuttal report: "there is absolutely no data or statistical evidence that self-removal is important." (Doc. 125-1, #7901). And in his March 16 declaration responding to R&L's motion to exclude his testimony, he more directly addressed that variable. He says that "the loader hiring rate for female applicants who applied for 'any' position at R&L is *higher* than the overall loader hiring rate for female applicants." (Doc. 153-7, #10627 (emphasis original)). Meaning, if he controlled for the variable, he says it "would actually *increase* the female hiring shortfall." (*Id.* at #10627–68 (emphasis original)). So it cannot be a major omitted factor.

R&L contests this analysis—and argues that Neumark has omitted some applications which affect his analysis and conflated raw-data and regression analysis (Doc. 172, #11790). This may be true, but like the expert in *Conwood*, Neumark accounted for the variable, so this ought to be a question for the jury.

14

### iv.    Active applications

Turn now to the second omitted variable—whether an application is active. Applications were active for six months after being submitted. R&L says this is also a major explanatory variable. (Doc. 132, #8993). Here, R&L offers some evidence that this is a major variable. In White's expert report, he shows that splitting the analysis into six-month pools results in a dramatic reduction in any statistically significant gender differential in hiring. (Doc. 127-4, #8470).

But again, like *Conwood* suggests, Neumark accounts for this variable later on. In his depositions (Doc. 120, #6840; Doc. 137, #9622), his rebuttal report (Doc. 125-1, #7892), and his March 16 declaration (Doc. 153-7, #10628–29), Neumark explained that he intentionally decided against pooling the data into six-month increments, citing common statistical practice. This strikes the Court as a reasonable position—slicing the pool into six-month segments creates small sample sizes, making statistical significance tougher to come by. The Court understands why R&L would advocate for this approach, and the Court agrees with R&L that this may be fertile grounds for cross-examination. But as Neumark has accounted for the variable, and explained why he made the choice he did, his testimony is admissible. Whether the jury will agree with that method is a separate issue, but not one for the Court to decide.

### v.    Recruiter era

Finally, let's consider the third omitted variable—which recruiter hired the applicant. As R&L explains, each Recruiting Specialist had independent hiring

criteria, (Doc. 132, #9002–03), though looking at those criteria suggests that they were not dramatically different (Doc 130-1, #8871–86). When controlling for who hired the applicant, R&L's expert, Paul White, says the gender hiring differential dramatically reduces. (Doc. 132, #9002). But again, Neumark's analysis accounts for this variable as well—in his rebuttal report, he disputes White's conclusions about how this variable affects his conclusions. (Doc. 125-1, #7903). Given that he accounted for the variable as *Conwood* asks, whether his explanation is meritorious is once again for the jury to decide, after vigorous cross-examination by R&L.

### b.    Other material errors

R&L also claims that Neumark's analysis contains serious flaws which make it inherently unreliable. (Doc. 132, #9004). These flaws include things like: not searching for typos of "forklift," when looking for applications containing forklift experience, and each of the following, which the Court takes from R&L's motion:

- Systemic coding errors with respect to the "not signed" factor. It was always set to 1 for the paper applications in Dr. Neumark's dataset, indicating that applicants did not sign their applications. However, the paper applications were almost always signed.
- Dr. Neumark only utilized the conviction box (yes/no). An applicant did not check the box but listed several actual convictions, which erroneously resulted in no conviction in Dr. Neumark's dataset.
- Dr. Neumark erroneously listed anyone with a flexible salary as an actual salary of $0.
- There is an application that suggested that someone finished a year of college, but wrote "none" into the degree field, resulting in no education.
- There is an application that contained "associate's" in the major field, but the applicant just wrote "degree" into the degree field, resulting in a flag of bachelor's rather than associate's.

(*Id.* at 9005–06 (cleaned up)). The Court agrees that these appear to be errors. But R&L offers *no* evidence that these errors affect Neumark's conclusions in any way. Meanwhile, Neumark offers affirmative evidence in his rebuttal report that controlling for at least some of these errors would not affect his conclusions. (Doc. 125-1, #7919). Questions of accuracy and weight are left to the jury. R&L has not shown that these errors make Neumark's conclusions about discrimination unreliable. The company will have its opportunity to question him about these "mistakes" on cross-examination.

### c.     The low $R^2$ value

R&L argues that the low $R^2$ value here means that Neumark's testimony must be excluded, relying on *Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281 (7th Cir. 1986). (Doc. 132, #8978). But the district court affirmed by *Griffin* held that the testimony there "would not support an inference of discrimination because the $R^2$ was low *and* because there was a lack of individual examples of discrimination." *Griffin*, 795 F.2d at 1292 (emphasis added). Moreover, the *Griffin* court was addressing a somewhat different issue there than presented here. In *Griffin*, the question was whether the statistics sufficed to establish a prima facie case of discrimination, or whether defendant had successfully rebutted any such inference. So the district court was making "an informed decision about the *probative* value of plaintiffs' statistics." *Id.* (emphasis added). Here, by contrast, the question is one of admissibility at trial. Finally, the *Griffin* court explicitly noted that "the $R^2$ alone

cannot determine the validity of a model. We recognize that sex discrimination may be present even though $R^2$ is low." *Id.* at 1292 n.23.

This follows the best practices recommended to courts. True, "the $R^2$ value is appropriately considered in assessing statistical models." *Id.* at 1291 (citations omitted). But, "[a]s a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another." Rubinfeld, *Multiple Regression*, in *Sci. Evid.* at 216–17. Unlike in *Griffin*, here there is anecdotal evidence, the Court is considering admissibility rather than probative value, and Neumark performed *multiple* regression analyses, not one regression. Yes, he concedes that the $R^2$'s for the models are low. But Neumark explains that "[f]airly low R-squared values are very common when looking at data on individual decisions or outcomes," such as in the context of allegedly discriminatory hiring. (Doc. 125-1, #7923). And he also notes that at least one "famous paper" in the field had $R^2$ values like those he achieved here, and that "[p]ublished research in economics commonly draws strong conclusions based on size and significance of effects, without regard to explanatory power." (*Id.*). R&L and its expert may disagree, and R&L can probe this issue on cross-examination. But, again, the probativeness of Neumark's report is a question for the jury.

In sum, R&L has identified definite potential shortcomings in Neumark's regression analysis. None of them, though, whether considered alone or in combination, are severe enough to prevent the EEOC from presenting the evidence to the jury. It will then be up to the jury to decide whether the EEOC or R&L has the

better of the battle of the statistical experts. Thus, the Court **DENIES** R&L's Motion to Exclude Neumark's Testimony and Opinions (Doc. 132).

## II. Shared Services' Motion for Summary Judgment

The party seeking summary judgment bears the initial burden to show the lack of a genuine issue of material fact in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Afterward, the non-movant can avoid summary judgment only by pointing to evidence sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making that determination, though, the Court must view the evidence in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Resolving Shared Services' Motion ends up a straightforward task. Though Shared Services raises many other arguments in the motion, Shared Services conceded at oral argument that the motion fails if the Court admits Neumark's testimony, since that testimony would create a genuine dispute of material fact. And Shared Services was right to make that admission—the EEOC says that Neumark's statistical analysis shows R&L had a pattern of discriminating against women, while R&L's statistics say otherwise. That creates a triable issue of fact, leaving to the jury to weigh the competing evidence. *Conwood*, 290 F.3d at 794. As explained above, the Court *will* admit Neumark's testimony. Since that creates a contested issue of material fact, the Court **DENIES** Shared Services' Motion for Summary Judgment (Doc. 130).

### III.    Inc.'s Motion for Summary Judgment

Inc. moves for summary judgment because it says it cannot be held responsible for any alleged discrimination by Shared Services. (Doc. 131, #8894). The EEOC, however, says that the two companies "are so interrelated that they constitute an integrated enterprise and are thus liable under Title VII." (Doc. 160, #11272 (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983) *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006))). This motion, then, turns on whether the two companies constitute an integrated enterprise. The Court finds that they do.

An integrated enterprise exists between companies when they share:

a.  interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment;
b.  common management, common directors and boards;
c.  centralized control of labor relations and personnel; and
d.  common ownership and financial control.

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993–94 (6th Cir. 1997) (numbering changed) (citing *York v. Tenn. Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir. 1984)). "All four criteria need not be present in all cases and, even when no evidence of common control of labor relations policy is presented, the circumstances may be such that the Title VII single-employer doctrine is applicable." *Armbruster*, 711 F.2d at 1338. At least three of the four factors suggest the existence of an integrated enterprise. The Court will address each in turn.

#### a.    Interrelation of operations

Inc. and Shared Services share an interrelation of operations. When "two entities set forth a shared principal address … [it] shows there may be common or

interrelated aspects to their operations." *EEOC v. Care Ctrs. Mgmt. Consulting, Inc.*, 942 F. Supp. 2d 771, 779 (E.D. Tenn. 2013). Using the same logo and similar advertising also suggests interrelation. *See EEOC v. Indi's Fast Food Rest. Inc.*, No. 3:15-cv-590, 2016 WL 7473130, at *3 (W.D. Ky. Dec. 28, 2016). Interrelation of operations also exists when "two companies provided exclusive services to each other, were marketed as twin operations, used each other's logo and letterhead interchangeably, issued checks on each other's behalf, and kept business and personnel records at the same office." *Swallows*, 128 F.3d at 994 (citing *EEOC v. Dolphin Cruise Line, Inc.*, 945 F. Supp. 1550, 1553–54 (S.D. Fla. 1996)).

The two companies share a headquarters. (Doc 134-1, #9568). The companies share the same name when advertising to prospective employees—"[t]he on-line recruiting guide for 'R&L Carriers' for dockworkers, drivers, management employees, mechanics, security, information technology, and hardware support makes no distinction between R&L Carriers, Inc. and R&L Carriers Shared Services, LLC." (*Id.* at #9575). The service agreement between the two companies specifies that Shared Services will provide Inc. with "accounting, tax and payroll services; maintenance of files; legal services; business supplies and the provision of executive and necessary management personnel." (Doc. 160, #11274).

Meanwhile, though R&L notes that Inc. has not used the services agreement since 2008 (Doc. 131, #8901–02), its subsidiaries use those services—including one wholly owned subsidiary who leases all its employees from Shared Services. (Doc. 134, #9547). And while each characteristic discussed in the cases above was

determinative at the motion-to-dismiss stage, all the characteristics *together* seem enough to establish interrelation at the summary-judgment stage. So this factor favors a finding that the two companies constitute an integrated enterprise.

### b.　Common management

When two companies share corporate officers, this suggests an integrated enterprise. *See Care Ctrs. Mgmt.*, 942 F. Supp. 2d at 779. Inc. and Shared Services shared 29 corporate officers, including their Chairman, CEO, President, CFO, and many Vice-Presidents. (Doc. 134-1, #9566–67). So this factor also favors a finding that the two companies constitute an integrated enterprise.

### c.　Centralized control of personnel

When employees in both companies "report to common authority figures, who both appear authorized to take some employment action" this suggests that the companies are an integrated enterprise. *Indi's Fast Food*, 2016 WL 7473130, at *4. While Inc. has no employees, as the previous factor suggests, it shares corporate officers with Shared Services, including Vice-Presidents of both Operations and Human Resources. (Doc. 113-7, #5524–25, 5527–28). So the Shared Services employees reported to officers seemingly wielding hiring and firing power, who occupied the same positions of authority in Inc. as well. This means Shared Services employees report to common authority figures of both companies. So the third factor favors a finding of an integrated enterprise.

### d.    Common ownership

The Sixth Circuit has suggested that the fourth factor is not met when neither of the companies is a sham. *Swallows*, 128 F.3d at 995. The Court *does* find the corporate structure a little suspect. Members of the Roberts family own Inc. and indirectly own Shared Services. (Doc. 134-1, #9565). This fact is clear from deposition testimony. (*See generally* Doc. 113-7). R&L repeatedly makes the misleading claim that Inc. only owns a minor stake of Shared Services (Doc 131, #8898), without addressing the fact that Inc.'s owners and wholly owned subsidiaries own *all the rest of* Shared Services. The EEOC offers a useful chart to illustrate that fact:



(Doc. 134-1, #9565). That structure could easily be a tactic to put some distance between Inc. and Shared Services without giving up any ownership interest. But the Court is reluctant to inquire into motives, so this factor hangs in equipoise.

Still, the other factors suggest that the two companies constitute an integrated enterprise and the fourth factor does not refute that, so the Court finds that they do. Thus, the Court **DENIES** Inc.'s Motion for Summary Judgment (Doc. 131).

## IV.    The EEOC's Motion for Partial Summary Judgment

The EEOC moves for partial summary judgment against four of R&L's affirmative defenses—whether:

- the EEOC satisfied its statutory obligation to try to resolve determined violations through informal conciliation before it filed its lawsuit (Fourth Affirmative Defense)
- the EEOC's claim is barred by a statute of limitations (Fifth Affirmative Defense)
- the EEOC's claim is barred because rejected female applicants did not exhaust administrative remedies (Eleventh Affirmative Defense); and
- Inc. is an employer because it is part of an integrated enterprise with Shared Services (Eighteenth Affirmative Defense).

(Doc. 134, #9523–24 (cleaned up)). The Court **DENIES AS MOOT** the EEOC's Motion (Doc. 134) as to the Fourth Affirmative Defense, failure to engage in conciliation. That is because R&L withdrew that defense at oral argument, after being informed that the remedy would be to push back its trial date and recommence conciliation. The Court **GRANTS** the Motion as to the Eighteenth Affirmative Defense, given that the Court already determined above that Shared Services and Inc. constitute an integrated employer. What remain are the Fifth and Eleventh Affirmative Defenses. Those are fairly straightforward to resolve.

The statute of limitations to which the Fifth Affirmative Defense refers applies to individual plaintiffs, but "imposes no limitation upon the power of the EEOC to file suit in a federal court" itself. *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 366 (1977). As the EEOC brings this suit of its own volition as a pattern-or-practice case, the statute of limitations does not apply. So the Court **GRANTS** the EEOC's Motion as to the Fifth Affirmative Defense.

Similar logic applies to the Eleventh Affirmative Defense. The Sixth Circuit has held that the EEOC can bring a discrimination action on behalf of individuals who did not themselves pursue any discrimination claims. *See EEOC v. Keco Indus.*, 748 F.2d 1097, 1101 (6th Cir. 1984). This means there cannot be an exhaustion requirement when the EEOC itself brings the action. So the Court also **GRANTS** the EEOC's Motion as to the Eleventh Affirmative Defense.

## CONCLUSION

For these reasons, the Court **DENIES** R&L's Motion to Exclude Neumark's Testimony and Opinions (Doc. 132), R&L's Motion to Strike Neumark's March 16, 2022, Declaration (Doc. 163), Shared Services' Motion for Summary Judgment (Doc. 130), and Inc.'s Motion for Summary Judgment (Doc. 131). The Court **GRANTS** in part the EEOC's Motion for Partial Summary Judgment (Doc. 134), as to R&L's Fifth, Eleventh, and Eighteenth Affirmative Defenses, but **DENIES** it as moot as to R&L's Fourth Affirmative Defense, given that R&L withdrew that defense at oral argument.

**SO ORDERED.**

March 27, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**